Slip Op. 20-122

# UNITED STATES COURT OF INTERNATIONAL TRADE

ZHEJIANG MACHINERY
IMPORT & EXPORT CORP.,

      Plaintiff,

   v.

UNITED STATES,

      Defendant.

Before: Gary S. Katzmann, Judge
Court No. 19-00039

***PUBLIC VERSION***

## OPINION

[The court remands Commerce's determination for further explanation and consideration of evidence.]

          Dated: <u>August 21, 2020</u>

<u>Adams C. Lee</u>, Harris Bricken McVay LLP, of Seattle, WA, argued for plaintiff.

<u>Kelly A. Krystyniak</u>, Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice and <u>Nikki Kalbing</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, DC, argued for defendant. With them on the brief and supplemental briefs were <u>Joseph H. Hunt</u>, Assistant Attorney General, <u>Ethan P. Davis</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>L. Misha Preheim</u>, Assistant Director and <u>Patricia McCarthy</u> for <u>L.Misha Preheim</u>, Assistant Director. Of counsel on the brief was <u>James Henry Ahrens II</u>, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Justice of Washington, DC.

    Katzmann, Judge: This case involves whether an exporter in a non-market economy ("NME") has sufficiently established independence from government control to qualify for a separate duty rate and avoid a countrywide antidumping duty rate. It also presents questions about whether nominal ownership of majority shareholder rights by a labor union may prevent a company from rebutting a presumption of government control.

Plaintiff Zhejiang Machinery Import & Export Corporation ("ZMC" or "Plaintiff"), an exporter of tapered roller bearings and parts thereof ("TRBs"),[1] brought an action against the United States ("the Government") to challenge a final determination by the United States Department of Commerce ("Commerce"). See Pl.'s Mem. of Points in Supp. of Mot. for J. on Agency R. at 1, Aug. 22, 2019, ECF No. 24 ("Pl.'s Br."); Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China, 84 Fed. Reg. 6,132, 6,132–34 (Dep't Commerce Feb. 26, 2019), ("Final Results").  In its Final Results, Commerce denied ZMC a separate rate and applied the country-wide rate after finding ZMC failed to show an absence of de facto control by the government of China ("GOC").  See Final Results.  ZMC requests that the court remand both this decision, because it is "unsupported by substantial evidence and is otherwise not in accordance with law," and Commerce's decision to reject one of ZMC's submissions, for the same reason.  Am. Compl. at 5, May 24, 2019, ECF No. 17; see 30th Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Rejection of Untimely-Filed New Factual Information (Dec. 3, 2018), P.R. 253 ("Rejection Letter").  The Government responds that the court should deny ZMC's motion because substantial evidence supports Commerce's decisions and because ZMC failed to exhaust administrative remedies for several of its arguments.  Def.'s Opp'n to Pl.'s Mot. for J. on the Agency R. at 7, 12, 25, Nov. 11, 2019, ECF No. 28 ("Def.'s Br.").  The court remands this matter to Commerce for a more reasoned explanation of its denial of a separate rate and for consideration of the evidence it rejected.

---

[1] "TRBs are a type of antifriction bearing made up of an inner ring (cone) and an outer ring (cup). Cups and cones sell either individually or as a preassembled 'set.'"  NTN Bearing Corp. of Am. v. United States, 127 F.3d 1061, 1063 (Fed. Cir. 1997).

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2).  The court sustains Commerce's antidumping determinations, findings, and conclusions unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## BACKGROUND

### I.    *Legal and Regulatory Framework*

Commerce may impose remedial duties on imported goods sold in the United States if the agency determines that a domestic industry is "materially injured, or is threatened with material injury" because the goods are sold at a less-than-fair value.  19 U.S.C. § 1673; see, e.g., Diamond Sawblades Mfrs. Coal. v. United States, 866 F.3d 1304, 1306 (Fed. Cir. 2017); Shandong Rongxin Imp. & Exp. Co. v. United States, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394 (2018) ("Rongxin III").  The measure of the remedial "antidumping duty is 'the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise.'"  Rongxin III, 331 F. Supp. 3d at 1394 (quoting 19 U.S.C. § 1673).  Commerce may conduct a yearly review of the antidumping duty at the request of an interested party and recalculate a new antidumping duty amount.  19 U.S.C. § 1675(a)(1)–(2).

When the antidumping duties apply to goods from an NME country, "Commerce presumes that all respondents to the proceeding are government-controlled and therefore subject to a single country-wide antidumping duty rate."  Rongxin III, 331 F. Supp. 3d at 1394 (citing Dongtai Peak Honey Indus. Co. v. United States, 777 F.3d 1343, 1349–50 (Fed. Cir. 2015)); see also Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997).  To rebut this presumption and receive a rate separate from the country-wide rate, respondents must

demonstrate that the government lacks both de jure and de facto control over their activities.

Rongxin III, 331 F. Supp. 3d at 1394.

A respondent may show an absence of de jure government control by presenting evidence of "legislation and other governmental measures that suggest sufficient company legal freedom." AMS Assocs., Inc. v. United States, 719 F.3d 1376, 1379 (Fed. Cir. 2013) (citation omitted). A respondent may show an absence of de facto government control by establishing that it does each of the following: "(1) sets its prices independently of the government and of other exporters, (2) negotiates its own contracts, (3) selects its management autonomously, and (4) keeps the proceeds of its sales (taxation aside)." Rongxin III, 331 F. Supp. 3d at 1394 (citing AMS Assocs., 719 F.3d at 1379); see also Yantai CMC Bearing Co. v. United States, 41 CIT__, __, 203 F. Supp. 3d 1317, 1326 (2017). If a respondent fails to demonstrate its independence, for which it has the burden of establishing, Commerce may deny it a separate rate and instead apply the country-wide antidumping rate. See, e.g., Sigma Corp., 117 F.3d at 1405–06.

Commerce's antidumping determinations must be supported by substantial evidence; otherwise, the court will hold them unlawful. Atl. Sugar, Ltd. v. United States, 744 F.2d 1556, 1559 (Fed. Cir. 1984); see also Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 982 (Fed. Cir. 1994) (citing 19 U.S.C. § 1516a(b)(1)(B)). Substantial evidence is measured by being "more than a mere scintilla." Altx, Inc. v. United States, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting Atl. Sugar, 744 F.2d at 1562). Substantiality of the evidence is also met by "something less than the weight of the evidence." Id. (quoting Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 933 (Fed. Cir. 1984)). Furthermore, a determination by Commerce "is supported by substantial evidence if a reasonable mind might accept the evidence as sufficient

to support the finding." Maverick Tube Corp. v. United States, 857 F.3d 1353, 1359 (Fed. Cir.

2017) (citing Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)).

## II.    *Factual and Procedural History*

In 2009, Commerce updated the antidumping duty rate on TRBs for the People's Republic

of China ("PRC") to 92.84 percent, after first setting an antidumping duty on TRBs in 1987. See

Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic

of China, 74 Fed. Reg. 3,987, 3,989 (Dep't Commerce Jan. 22, 2009) ("the Order"); Tapered Roller

Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China, 52 Fed.

Reg. 22,667, 22,667 (Dep't Commerce June 15, 1987); see also Decision Memorandum for the

Preliminary Results of the 2016–2017 Antidumping Duty Administrative Review of Tapered

Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China

at 14 (Dep't Commerce July 12, 2018), P.R. 223 ("Preliminary Decision Memo"). In June 2017,

Commerce published a notice of opportunity to request review of the Order. Antidumping or

Countervailing Duty Order, Finding, or Suspended Investigation: Opportunity to Request

Administrative Review, 82 Fed. Reg. 26,441, 26,441 (Dep't Commerce June 7, 2017).

In response, a domestic interested party requested that Commerce conduct an

administrative review of ZMC's entries during the period of June 1, 2016 to May 31, 2017.

Administrative Review of Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof,

Finished and Unfinished, from the People's Republic of China (06/01/16–05/31/l7): The Timken

Company's Request for Administrative Review (June 30, 2017), P.R. 5; see also Def.'s Br. at 2.

The domestic interested party then submitted files indicating GOC ownership of ZMC, and ZMC

responded with its own submissions. See Administrative Review of the Antidumping Duty Order

on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's

Republic of China: The Timken Company's Submission of Factual Information in Response to Certain Separate Rate Certifications Filed on August 31, 2017 (Sept. 14, 2017), P.R. 93; see, e.g., Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Factual Information Regarding Zhejiang Machinery (Oct. 2, 2017), P.R. 109 ("Oct. Submission"); 2016–2017 Administrative Review of Tapered Rollers Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Separate Rate Supplemental Questionnaire (Apr. 13, 2018), P.R. 169; Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Supplemental Questionnaire Response & Separate Rate Application (May 4, 2018), P.R. 184 ("May Submission").

Included in ZMC's submissions were details of its ownership structure. ZMC stated it was 100 percent owned by its parent company, Zhejiang Sunny I/E Corp ("Sunny"). Oct. Submission at 2. ZMC further noted that Sunny, in turn, was owned by Zhejiang Province Metal & Minerals Import and Export Co., Ltd., and Sunny's labor union, with the labor union as majority owner. Id. Zhejiang Province Metal & Minerals Import and Export Co., Ltd., was fully owned by Zhejiang International Business Group Co., Ltd., whose complete owner was the Zhejiang Provincial State-owned Assets Supervision and Administration Commission ("SASAC"). May Submission at 8. ZMC also stated that Sunny's labor union was listed as the nominal owner of the majority of Sunny's shares in Sunny's Articles of Association ("Sunny's Articles" or "Sunny's AoAs") because the ultimate owners of those shares were members of Sunny's employee stock ownership committee ("ESOC"), which is not allowed legal personhood under Chinese law and therefore could not be assigned shares. Id. at 4–5.

Commerce preliminarily determined that ZMC failed to demonstrate that the GOC lacked de facto control over its export activities. See Tapered Roller Bearings and Parts Thereof, Finished

and Unfinished, from the People's Republic of China, 83 Fed. Reg. 32,263, 32,263 (Dep't Commerce July 12, 2018) ("Preliminary Results"); see also Preliminary Decision Memo at 11. Commerce's primary support for this decision was that Sunny's labor union and the GOC-owned SASAC together own 100 percent of Sunny, which in turn owns 100 percent of ZMC. Id. at 11. Commerce argued that because all labor unions are under the "control and direction of the" All-China Federation of Trade Unions ("ACFTU") according to Chinese law and because the ACFTU is "a government affiliated and [Communist Party of China] organ[,]" the GOC has the potential to control ZMC's export activities. Id. at 11 (internal citations, brackets, quotation marks omitted); see also Def.'s Br. at 4.  Accordingly, Commerce concluded the GOC's actual or potential control over ZMC meant ZMC failed to rebut the presumption of de facto government control over its export activities and was therefore ineligible for a separate rate for its exports of TRBs. Preliminary Decision Memo at 11; see also Preliminary Results.

Six weeks after Commerce published the Preliminary Results, on August 23, 2018, ZMC submitted a case brief that included, among other information, a revision of the original translation of the ESOC's Articles of Association ("ESOC Articles") it had provided to Commerce.  Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Case Brief at 3, P.R. 241 ("Aug. Submission"); see also Pl.'s Br. at 20; Def.'s Br. at 5.  This revised translation changed [[

]] whereas the original translation indicated [[

]], Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Resubmission of Case Brief at Ex. 7 (Dec. 6, 2018), P.R. 162 ("Dec. Submission").  See also Pl.'s Br. at 21.

Several months later, on December 3, 2018, Commerce determined that the brief submitted in August 2018 included untimely factual information, rejected it, and allowed ZMC the opportunity to submit a revised brief.  See Rejection Letter.  ZMC did so several days later, submitting a brief without the revised translation.  See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Resubmission of Case Brief (Dec. 6, 2018), P.R. 255 ("Revised Case Brief").

In the Revised Case Brief, ZMC again noted the labor union that owns a majority of Sunny is a proxy owner for Sunny's ESOC, which in turn effectively controls the majority shareholder rights of Sunny.  Revised Case Brief at 2–3.  ZMC claimed that the labor union lacks the authority to make shareholder decisions or to control the management of Sunny, and therefore ZMC, because: (1) the ESOC has the authority to "protect and promote the interests of Sunny's private employees"; (2) the ESOC's members elect leaders to form the ESOC Council by majority vote, in which each member receives one vote; and (3) the Council elects three out of Sunny's five board members.  Id. at 3–6 (citing Advanced Tech. & Materials Co. v. United States, 36 CIT 1576, 1588, 885 F. Supp. 2d 1343, 1355 (2012) ("Diamond Sawblades I")).  ZMC also noted that no member of the ESOC "holds any positions or membership in" the ACFTU and all but one member of the ESOC hold no "position with Sunny's labor union."  Revised Case Brief at 4.  The member who holds a union position, [[                        ]], is [[                                    ]] and is [[                              ]].  Id. at 5.  ZMC stated in its Revised Case Brief that no ESOC members are "affiliated with[] the Chinese government," id. at 3, and that Sunny's three Council-appointed directors are not affiliated with the GOC or "hold positions with" Sunny's labor union, id. at 5.  Moreover, although ZMC did not directly address Commerce's contention that the

ACFTU effectively controls all labor union actions, it did note that [[

]]. Id.

In February 2019, approximately six months after ZMC submitted the revised translation, which Commerce rejected, Commerce published its final determination, in which it maintained its decision in its Preliminary Results. Final Results; see also Mem. from J. Maeder to G. Taverman, re: Issues and Decision Mem. for the Antidumping Duty Administrative Review at 4–14 (Dep't Commerce Feb. 19, 2019), P.R. 262 ("IDM"). In addition to repeating the primary reasons set forth in its Preliminary Results, Commerce also found the SASAC and the labor union had the ability to control Sunny's management, and therefore ZMC's activities, per the reasoning in Diamond Sawblades I.[2] IDM at 10 (quoting Diamond Sawblades I, 36 CIT at 1588–89). Commerce further disagreed with ZMC's contention that it should disregard the labor union's nominal ownership because "the individual owners of Sunny's ESOC are all labor union members . . . even if they do not all currently hold official positions in" the union. Id. at 11 (citing Revised Case Brief at 2).

Commerce also noted that the labor union has the "inherent ability" to exercise shareholder rights, including appointment of Sunny's board members, as majority owner. Id. Commerce reasoned that ZMC's argument -- that the ESOC has control over selecting Sunny's management -- did not rebut the presumption of government control because Chinese law: (1) did not allow the

---

[2] The court in Diamond Sawblades I identified "the possession of autonomy from the government regarding the 'selection' of management" as one of four factors typically considered in the de facto prong analysis. Advanced Tech. & Materials Co. v. United States, 36 CIT 1576, 1588, 885 F. Supp. 2d. 1343, 1355 (2012) ("Diamond Sawblades I"). Although a determination on this factor does not preclude Commerce from analyzing other factors, see Shandong Rongxin Imp. & Exp. Co. v. United States, 41 CIT __, __, 203 F. Supp. 3d 1327, 1348 (2017), government control may exist even through a "chain of indirect ownership," Yantai CMC Bearing Co. v. United States, 41 CIT __, __, 203 F. Supp. 3d 1317, 1323 (2017).

ESOC to be registered as an owner; (2) required Sunny's labor union to be registered under the local branch of the ACFTU, which it was; and (3) gave the GOC-affiliated ACFTU a "legal monopoly on all trade union activities." IDM at 12–13 (citing 30th Administrative Review of the Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: China's Status as a Non–Market Economy at 21 (Dep't Commerce Oct. 26, 2017), P.R. 226 ("NME Status Memo")).

Finally, Commerce noted two other reasons for rejecting ZMC's arguments. First, the SASAC still controlled two seats on Sunny's board and could block some corporate decisions. Id. at 13 (citing Oct. Submission at Ex. 1). Second, ZMC's Revised Case Brief was silent as to the composition of Sunny's Audit Department, which governs the ESOC. IDM at 13. Commerce thus concluded that ZMC had "failed[ed] to rebut Commerce's presumption of government control in China" and found ZMC ineligible for a separate rate. Id.

On March 25, 2019, ZMC filed a complaint to challenge Commerce's Final Results as unsupported by substantial evidence and otherwise not in accordance with the law. Compl. at 5, Mar. 25, 2019, ECF No. 2. ZMC amended its complaint on May 24, 2019, adding a challenge to Commerce's rejection of ZMC's August Submission. Am. Compl. at 5. On August 22, 2019, ZMC filed a Rule 56.2 motion for judgment on the agency record. See Pl.'s Br. The Government responded on November 11, 2019, detailing its opposition to ZMC's motion. See Def.'s Br. ZMC replied on January 7, 2020. See Pl. Zhejiang Machinery I&E's Reply Br., ECF No. 31 ("Pl.'s Reply"). In advance of oral argument, on July 1, 2020 the court posed questions to the parties for their written responses. See Ct.'s Letter Regarding Questions for Oral Arg., ECF No. 37. The parties submitted responses to those questions on July 13, 2020. See Pl.'s Resp. to Pre-Oral Argument Questions, ECF No. 38, ("Pl.'s Answers"); Def.'s Resp. to the Court's Questions for

Oral Argument, ECF No. 39 ("Def.'s Answers").  The court submitted supplemental questions to

the parties on July 14, 2020.  <u>See</u> Ct.'s Letter Regarding Suppl. Questions for Oral Arg., July 14,

2020, ECF No. 40.  The court held oral argument via teleconference on July 15, 2020.  ECF No.

41.  The parties provided answers to the supplemental questions on July 17, 2020.  <u>See</u> Pl. ZMC's

Resps. to Addt'l Pre-Oral Arg. Questions and Commerce's Oral Arg. Statements, ECF No. 42

("Pl.'s Suppl. Answers"); Def.'s Resps. to the Ct.'s Suppl. Questions for Oral Arg., ECF No. 43

("Def.'s Suppl. Answers").

## DISCUSSION

ZMC argues that (1) Commerce's denial of a separate rate was not supported by substantial

evidence on the record; and (2) Commerce's rejection of its August Submission was arbitrary and

capricious because it contained corrective information.  The Government responds that (1) three

arguments ZMC now raises -- regarding union membership, GOC control over the ACFTU, and

capital contributions of the ESOC members -- fail to meet administrative exhaustion

requirements; (2) Commerce appropriately rejected ZMC's August Submission as untimely new

factual information; and (3) Commerce's denial of ZMC's separate rate, based on the GOC's

potential to control ZMC through majority labor union ownership of Sunny, was supported by

substantial evidence on the record.  ZMC replies, in part, that it did not fail to exhaust

administrative remedies or, in the alternative, that the court in its discretion should not require

administrative exhaustion in this case.

For the reasons stated below, the court remands to Commerce its determination that ZMC

failed to establish an absence of de facto government control over its activities so that Commerce

may: (1) consider the revised translation; (2) address how the labor union could exercise its rights

as majority shareholder in light of the evidence regarding the ESOC; and (3) address how the

revised translation impacts its analysis.  The court takes no position, however, on the correctness of Commerce's determination. The court finds only that Commerce failed to meet its obligation to consider corrective information and provide a reasoned explanation for its determination.  The court, therefore, cannot sustain Commerce's <u>Final Results</u> here.

### I.    *Commerce's Rejection of ZMC's August Submission Was Not Supported by Substantial Evidence or in Accordance with Law.*

After Commerce's publication of its <u>Preliminary Results</u> in July 2018, ZMC submitted a case brief in August 2018 that included a revised translation of one Article in the ESOC's Articles. Specifically, the revised translation changed [[

]] whereas the original translation indicated [[                                                                        ]] December Submission at Ex. 7.  ZMC explained that the original version it submitted "incorrectly added the term, 'labor union,' in Articles 1 and 2, which does not appear in the official Chinese version." Aug. Submission at 3.  In December 2018, Commerce rejected the brief pursuant to 19 C.F.R. § 351.302(d)(1)(i), explaining that the translation constituted "new factual information," which ZMC had submitted after the May 4, 2018 deadline.  Rejection Letter at 1.  ZMC then submitted its Revised Case Brief without this information, which Commerce accepted.

ZMC argues that this rejection was not supported by substantial evidence on the record or not in accordance with law, Am. Compl. at 5–6, and that it was arbitrary and capricious, Pl.'s Br. at 33.  ZMC argues that the information was not new, but rather corrective, to which no time limits apply.  Pl.'s Br. at 34.  ZMC further claims "interests of accuracy" outweigh Commerce's burden in limiting its consideration of new factual information and therefore that Commerce should have accepted the August Submission, making its rejection arbitrary.  <u>Id.</u> at 34–35 (citing <u>Goodluck India Ltd. v. United States</u>, 43 CIT __, __, 393 F. Supp. 3d 1352, 1357 (2019)).

The Government argues that according to Commerce's regulations -- which ensure adequate time to review information -- the brief contained factual information submitted more than three months late. Def.'s Br. at 26. The Government distinguishes <u>Goodluck</u>, <u>NTN Bearing</u>, and <u>Fischer</u> from its rejection of ZMC's brief by noting that cases in which courts found Commerce abused its discretion involved rejected information related to a "rote task readily subject to inadvertent or ministerial error" and not a translation of language. Def.'s Br. at 27. <u>See</u> <u>NTN Bearing Corp. v. United States</u>, 74 F.3d 1204, 1205 (Fed. Cir. 1995); <u>Fischer S.A. v. United States</u>, 34 CIT 334, 348, 700 F. Supp. 2d 1364, 1366 (2010), <u>aff'd in part</u>, <u>rev'd in part</u>. Because translation between Mandarin and English is a complex task, the Government argues deeming such information as corrective would "undermine the integrity" of Commerce's administrative proceedings. Def.'s Br. at 27–28. The Government also notes that had it accepted the revised translation, the <u>Final Results</u> may have been delayed because it would have had to allow interested parties to comment on the new factual information. <u>See</u> Def.'s Suppl. Answers at 2.

### A.      *The Regulatory Definitions of New Factual Information Fail to Cover Submission of the Revised Translation.*

Commerce's own regulations govern submission of factual information during its administrative reviews, including in a determination of whether a respondent has established independence from its government in an NME economy. <u>See</u> 19 C.F.R. § 351.301. The type of factual information to be submitted determines the "time limit for submission to Commerce." <u>Goodluck</u>, 393 F. Supp. 3d at 1357. Miscellaneous new factual information, for example, must be submitted "30 days before the scheduled date of the preliminary determination in an investigation, or 14 days before verification, whichever is earlier." 19 C.F.R. § 351.301(c)(5). The five definitions included in 19 C.F.R. § 351.102(b)(21) cover various types of "factual information;" 19 C.F.R. § 351.102(b)(21)(i) specifically defines "factual information" as "[e]vidence, including

statements of fact, documents, and data submitted either in response to initial and supplemental

questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested

party . . . ."[3]

Commerce did not note the definition under which the revised translation fell when

rejecting ZMC's August Submission pursuant to 19 C.F.R. § 351.302(d)(1)(i) for untimely factual

information.  See Rejection Letter at 1; see also Def.'s Br. at 25.  At oral argument and in its

answers to the court's supplemental questions, the Government claimed the revised translation

belonged to the definition for factual information corresponding to 19 C.F.R. § 351.102(b)(21)(i)

above.  Def.'s Suppl. Answers at 1.  It is inaccurate, however, to assign the first part of 19 C.F.R.

§ 351.102(b)(21)(i) to the revised translation because it was not submitted "in response to initial

and supplemental questionnaires."  Nor does the second part of 19 C.F.R. § 351.102(b)(21)(i)

apply because ZMC submitted the translation to clarify or correct information it had submitted

---

[3] 19 C.F.R. § 351.102(b)(21) also defines "factual information" as:

> (ii) Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;

> (iii) Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;

> (iv) Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by the Department; and

> (v) Evidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)–(iv) of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence.

itself, and not to rebut, clarify, or correct "evidence submitted by any other interested party." Even if the court were to find the Government's designation to be an impermissible post hoc rationalization not relied on by Commerce in its own explanation, none of Commerce's four other regulatory definitions of factual information cover ZMC's revised translation in its August Submission.[4]  See Hoogovens Staal BV v. United States, 22 CIT 139, 145, 4 F. Supp. 2d 1213, 1219 (1998) (citation omitted) (noting courts will not consider post hoc rationalizations).

---

[4] The translation does not fall under 19 C.F.R. § 351.102(b)(21)(iii) because it is not "publicly available." Because ZMC submitted the translation to clarify or correct information it had submitted itself, and not to rebut, clarify, or correct "evidence submitted by any other interested party," 19 C.F.R. § 351.102(b)(ii) and 19 C.F.R. § 351.102(b)(21)(v) do not apply.

19 C.F.R. § 351.102(b)(ii) could plausibly be read to include evidence submitted "in support of [any] allegations" made by any party, which would seem to cover the revised translation; however, this reading of 19 C.F.R. § 351.102(b)(ii) is flawed. First, a definition that included information that covers information submitted to support any allegation made by any party is simply too wide a definition to be meaningful and would render the other definitions redundant. Second, in its definitions Commerce consistently modifies nouns to specify whether the evidence is submitted by other parties or placed on the record by Commerce itself. Compare 19 C.F.R. § 351.102(b)(ii) (describing evidence "submitted by any other interested party) with 19 C.F.R. § 351.102(b)(iv) (detailing evidence "placed on the record by [Commerce]"). Thus, one would expect the phrase "submitted by any other interested party" in 19 C.F.R. § 351.102(b)(ii) to modify both "allegations" and "such evidence" in the definition. Therefore, since ZMC submitted the information in response to information it had submitted itself, the revised translation also does not fall under 19 C.F.R. § 351.102(b)(ii).

The only remaining plausible definition, 19 C.F.R. § 351.102(b)(iv) -- which covers "evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by [Commerce]" -- also does not cover the revised translation. Were ZMC to have submitted the original translation for it to be "placed on the record by the [Commerce]," then 19 C.F.R. § 351.102(b)(21)(iv) would plausibly cover the revised translation, making it new factual information according to Commerce's own definition. Commerce's own usage of such language, however, makes this reading of 19 C.F.R. § 351.102(b)(21)(iv) unconvincing. In its own IDM, Commerce refers to "[s]everal articles from the AOAs that Zhejiang Machinery placed on the record." Thus, since ZMC placed the original translation of the ESOC on the record and not Commerce, the submission of the revised translation fails to meet the definition under 19 C.F.R. § 351.102(b)(21)(iv).

ZMC's revised translation in its August Submission thus fails to fall under any of Commerce's own regulatory definitions for submissions of factual information; yet Commerce nonetheless identified the revised translation as factual information in its Rejection Letter. Although Commerce's own interpretations of its regulations are sometimes entitled to deference, Royal Thai Gov't v. United States, 436 F.3d 1330, 1340 (Fed. Cir. 2006) (citation omitted), here Commerce did not even identify which definition applies to the revised translation, Rejection Letter at 1.  Because Commerce failed to identify a definition, the court's deference here would need to rest on  Commerce's mere reference to the revised translation as new factual information. Because Commerce has failed to give more than an "ad hoc statement" as to why the revised translation constitutes factual information, deference is not appropriate.  Kisor v. Wilkie, 139 S. Ct. 2400, 2416 (2019) (citations omitted).

Moreover, if the agency's regulation is unambiguous as to an interpretation, then "a court should not afford Auer deference."  Kisor, 139 S. Ct. at 2415 (discussing the deference courts may give to regulatory agencies when the agencies interpret their own regulations, which the Court refers to as Auer deference); see also Auer v. Robbins, 519 U.S. 452 (1997).  This is a case where deference is inappropriate because: (1) as discussed above, "uncertainty does not exist" as to whether the language of 19 C.F.R. § 351.102(b)(21) covers the revised translation ZMC submitted; and (2) Commerce's interpretation in its Rejection Letter does not "reflect 'fair and considered judgement'" of the definitions of factual information.  Kisor, 139 S. Ct. at 2415–16 (quoting Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155 (2012)).

Consequently, because Commerce's regulatory definitions of factual information do not cover the revised translation, and because Commerce's classification of the revised translation as

factual information is not entitled to deference, the court finds that ZMC's submission of the revised translation was not a submission of new factual information.

**B.      *Relevant Caselaw also Distinguishes the Revised Translation from Submissions of New Factual Information.***

The caselaw generally distinguishes submissions of new factual information from submissions of other information, including minor corrections. Submissions of new, substantial information occur when: (1) the respondent submits information requested by Commerce to fill a gap in a response after withholding the information, Mukand, Ltd. v. United States, 767 F.3d 1300, 1305 (Fed. Cir. 2014); (2) the information submitted implicates the accuracy of the respondent's underlying production or cost reconciliations, Goodluck, 393 F. Supp. 3d at 1365 (citation omitted); or (3) the submission requires a "substantial revision" of a respondent's response, id. at 1365 (citation omitted). New factual information submissions do not occur when the respondent is rectifying minor reporting mistakes, even if those errors have a cascading impact on other calculations. See id. at 1364–67 (citing NTN Bearing, 74 F.3d at 1205).

ZMC's submission was not a result of the company withholding information from Commerce, nor did it require a "substantial revision" of ZMC's response in the manner described in the caselaw. See Goodluck, 393 F. Supp. 3d at 1365 (citation omitted) (noting the respondent's submission of corrective information would not result in revision to whole sets of already-submitted data because it did not impact underlying data). Although the revised translation could potentially "implicate the accuracy" of other elements of ZMC's submitted translations, it does not do so in the same manner as a submission that implicated the accuracy of underlying production or cost reconciliation data because mistranslation of a single phrase does not affect other elements of ZMC's submissions. In fact, ZMC consistently disclaimed ESOC involvement in the labor

union, even if it never explicitly claimed that the ESOC members were not also labor union members.  See, e.g., Revised Case Brief at 4, 9, 11; May Submission at Ex. 6.

The Government's claim that ZMC's rejected submission is distinguishable from other instances where Commerce's rejection of information was deemed an abuse of discretion is unpersuasive.  Even if the rejection of a revised translation presents a case of first impression, a revised translation of a few words is similar to other instances where courts deemed information corrective.  Although the Government is correct that the respondent's errors in NTN Bearing, Fischer, and Goodluck all concerned errors in numerical entries, whereas ZMC's concerns a language translation error, see Def.'s Br. at 27, each involves translation from thousands of individual pieces of information into another set of information that Commerce can more readily employ in its investigation.  This includes translating kilograms to gallons, Fischer, 700 F. Supp. 2d at 1366, or original sales data into data coded for product or geographical characteristics, NTN Bearing, 74 F.3d at 1207–08; Goodluck, 393 F. Supp. 3d at 1364.

In this case, ZMC claimed a translator made the perhaps questionable mistake of adding in a term that did not exist in the original Mandarin version in what turned out to be a significant segment of the translation, but as the Government admits, "[l]anguage translation . . . between languages as dissimilar as Mandarin and English, is a complex analytical task."  Def.'s Br. at 27. A translator's task of coding Mandarin characters or groups of characters to one of tens of thousands of words and phrases in English is likely just as complicated, and therefore just as difficult and prone to error, as coding sales data to one of a limited number of numerical entries. Given the "desire for accuracy in antidumping duty determinations," a revised translation of a few words stemming from an error committed in a difficult task is just as eligible to be deemed

corrective information as are the types of errors from <u>NTN Bearing</u>, <u>Fischer</u>, and <u>Goodluck</u>.  <u>See</u>

<u>Timken U.S. Corp. v. United States</u>, 434 F.3d 1345, 1353 (Fed. Cir. 2006) ("<u>Timken U.S.</u>").

Moreover, Commerce's suggestion that language translation errors are different than errors

from "rote tasks" or clerical errors because translation involves errors in "judging subtle

distinctions resulting from connotation and context" resembles a distinction Commerce has made

in the past with which the Federal Circuit has disagreed.  Def.'s Br. at 27.  The court in <u>Timken</u>

<u>U.S.</u> criticized Commerce's use "of the so-called 'Colombian Flowers Test,'" which required "the

error be of a 'clerical' nature, not a 'methodological error, a substantive error, or an error in

judgment'" to allow a correction.  434 F.3d at 1348.  The court specifically stated that "[t]o the

extent that Commerce cites <u>NTN Bearing</u> for the source of its distinction between 'clerical' and

other errors, we surmise that Commerce erroneously extrapolated one where none was stated or

intended."  <u>Id.</u> at 1353.  Commerce may "correct any type of importer error -- clerical,

methodology, substantive, or one in judgment . . . ."  <u>Id.</u>  Because the Government now raises a

similar distinction, the court finds its claim unpersuasive.

Therefore, because ZMC's revised translation does not meet any of Commerce's own

definitions for "factual information" and is similar to other submissions courts have accepted as

corrective information Commerce may accept, the court finds the revised translation is not factual

information but is instead corrective.

> ### C.    *Commerce's Rejection of ZMC's Submission of Corrective Information Was Not Supported by Substantial Evidence or in Accordance with Law.*

Commerce must follow its "procedures for the correction of ministerial errors in final

determinations," while ensuring "opportunity for interested parties to present their views regarding

any such errors."  19 U.S.C. § 1673d(e).  These statutory requirements, however, "cover only an

error committed by Commerce itself."  <u>Alloy Piping Prod., Inc. v. Kanzen Tetsu Sdn. Bhd.</u>, 334

F.3d 1284, 1290 (Fed. Cir. 2003). There is no regulation by Commerce "addressing whether an importer can correct errors in the information it has submitted" or "restrict[ing] the types of importer errors that are eligible for such correction." Timken U.S., 434 F.3d at 1353.

Commerce is not barred from "correct[ing] any type of importer error -- clerical, methodology, substantive, or one in judgment -- in the context of making an antidumping duty determination, provided that the importer seeks correction before Commerce issues its final results and adequately proves the need for the requested corrections." Id. Furthermore, failure by Commerce to accept corrective information from respondents may be an abuse of discretion because Commerce's duty is to determine dumping margins accurately. NTN Bearing, 74 F.3d at 1207–08 (Fed. Cir. 1995) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1189 (Fed. Cir. 1990)); see also Timken U.S. 434 F.3d at 1353 (noting the Federal Circuit has "only balanced the desire for accuracy . . . with the need for finality at the final results stage" in its assessment of Commerce's rejection of corrective information). In regard to accepting or denying corrective information, if "Commerce acted differently in [a given] case than it has consistently acted in similar circumstances without reasonable explanation[,] then Commerce's actions will have been arbitrary." Consol. Bearings Co. v. United States, 348 F.3d 997, 1007 (Fed. Cir. 2003).

The court finds Commerce's rejection of ZMC's revised translation was an abuse of discretion. It is Commerce's responsibility to determine dumping margins "as accurately as possible," in part because antidumping duties are not punitive, but remedial. NTN Bearing, 74 F.3d at 1207–08 (Fed. Cir. 1995) (quoting Rhone Poulenc, 899 F.2d at 1191); see Chaparral Steel Co. v. United States, 901 F.2d 1097, 1103–04 (Fed. Cir. 1990). Even if Commerce had reasons other than the finding it drew from the original translation for its Final Results, "Commerce's duty to determine [ZMC's] dumping margin as accurately as possible" still required Commerce to

accept information that may have corrected evidence on the agency record. Fischer, 700 F. Supp.

2d at 1376. Commerce's citation to potentially uncorrected evidence in its IDM as part of its

reasoning further supports that it abused its discretion in rejecting the revised translation. See id.;

Def.'s Br. at 20 n.2 (noting that the agency record upon which Commerce's final determination is

based reflects the original translation). Commerce's response in its IDM states in part:

> [W]e disagree that evidence on the record supports Zhejiang Machinery's argument
> that the labor union and the ESOC are unconnected . . . . Zhejiang Machinery relies
> on the fact that Sunny's directors do not hold positions in the labor union; however,
> it disregards the inconvenient fact that 1) the labor union is the controlling
> shareholder in Sunny; and 2) the individual owners of Sunny's ESOC are all labor
> union members. We find it relevant that the owners of Sunny's ESOC are all
> members of Sunny's labor union . . . . Indeed, Sunny's AOAs confirm the accuracy
> of these conclusions and further support them.

IDM at 11 (footnotes omitted). Since the revised translation in ZMC's August Submission calls

into question a major component of Commerce's response to ZMC, and Commerce itself indicated

its reliance on the "accuracy" of the original translation, the rejection undermines the accuracy of

Commerce's final determination.[5] Failure to consider the revised translation "to correct

information already provided was a violation of Commerce's duty to determine [ZMC's] dumping

margin as accurately as possible . . . ." Fischer 700 F. Supp. 2d at 1376. Interests of accuracy,

then, weigh in favor of a finding that Commerce abused its discretion.

---

[5] In its IDM, Commerce notes that "Sunny's AoAs" confirm its conclusion about ESOC
membership in the labor union. IDM at 11. Commerce does not refer to the "ESOC's Articles of
Association (AOAs)" for this conclusion but references them elsewhere in the IDM. IDM at 5.
Upon first glance, Commerce seems to be referencing Sunny's Articles of Association ("Sunny's
Articles"), which also appear in the agency record along with the ESOC Articles whose translation
ZMC attempted to revise. Following the reference to "Sunny's AoAs," however, is a footnote that
cites to "Zhejiang Machinery Supp SRA at Exhibit 7, Article 1," where the ESOC Articles appear.
See Dec. Submission at Ex. 7. Therefore, it is reasonable to assume that the reference to "Sunny's
AoAs," IDM at 11, refers to either to Sunny's Employee Stock Ownership Committee Articles of
Association, the ESOC Articles, or to the collection of Articles of Association involving Sunny,
including Sunny's Articles and the ESOC Articles. In either scenario, the ESOC Articles are
included.

Furthermore, in this case ZMC submitted its corrective information far before concerns of finality would have emerged.  Cf. Chengde Malleable Iron Gen. Factory v. United States, 31 CIT 1253, 1260, 505 F. Supp. 2d 1367, 1374 (2007) (holding that the "requirement of administrative finality necessarily outweighed [the importer-plaintiff's] belated concern for correctness."). Interests of finality typically do not arise until Commerce's issuance of its final determination. Timken U.S., 434 F.3d at 1354 (holding Commerce should have accepted new evidence because the respondent submitted it before Commerce "issued the final results"); Alloy Piping, 334 F.3d at 1293 (holding Commerce was not required to correct a non-apparent error if a respondent requests to correct the error after the final determination); NTN Bearing, 74 F.3d at 1208 (holding Commerce's rejection of new information was an abuse of discretion because it would not have delayed the final determination).  Here, ZMC submitted its revised translation in August 2018, a full six months before Commerce issued its Final Results in February 2019.  The submission, therefore, did not arrive during the final stages of the investigation.  This is also supported by the fact that Commerce waited until December 2018 to reject ZMC's August Submission.  Rejection Letter at 1.  Thus, the record does not support any tension "'between finality and correct result' at later stages of an investigation." Goodluck, 393 F. Supp. 3d at 1358 (citing NTN Bearing, 74 F.3d at 1208).

Even if finality of the translation itself is of concern, the Government itself claims the conclusions drawn from the original translation are only "relevant" to the final determination and are not dispositive.  Def.'s Br. at 30 (quoting IDM at 11).  A revised translation of a few, merely relevant words would hardly "have required beginning anew nor have delayed making the final determination."  Timken U.S., 434 F.3d at 1353 (quoting NTN Bearing, 74 F.3d at 1208). Moreover, the interest of finality discussed in the caselaw refers to finality of the determination,

not finality of the evidence submitted to make such a determination.  See, e.g., id., at 1352; Alloy

Piping, 334 F.3d at 1293; NTN Bearing, 74 F.3d at 1208.  Therefore, interests of finality as

applicable to the rejection of corrective information are moot.

   Because there were no concerns of finality and because Commerce violated its duty to

ensure accuracy in its determinations, it should consider the revised translation to make sure its

antidumping duty for ZMC is remedial and not punitive.  See Fischer S.A. Comercio, Industria &

Agricultura v. United States, 471 F. App'x 892, 895 (Fed. Cir. 2012).  Therefore, the court holds

that Commerce's rejection of the August Submission containing the revised translation was an

abuse of its discretion.  See also Fischer 700 F. Supp. 2d at 1376.

   The Government's final point -- that as a matter of policy, requiring Commerce to accept

this information would "expand the exception for 'corrective information' beyond its current limits

to a position that would undermine the integrity of Commerce's proceedings," Def.'s Br. at 28 --

is also uncompelling.  The same claim could be made if Commerce rejects corrective information

and then bases its conclusions on uncorrected information in the administrative record.  It is the

respondent's responsibility to "provide Commerce with 'accurate, credible, and verifiable

information.'"  Kaiyuan Grp. Corp. v. United States, 28 CIT 698, 720, 343 F. Supp. 2d 1289, 1310

(2004) (quoting Gourmet Equip. Corp. v. United States, 24 CIT 572, 574 (2000)).  Commerce,

however, should not reject proposed corrections well before its final determination and then base

its conclusions on potentially erroneous information because antidumping duties are "remedial,

rather than punitive, compensatory, or retaliatory."  Chaparral Steel Co. v. United States, 901 F.2d

1097, 1103, 1103 n.5, (Fed. Cir. 1990) (explaining that a contrary reading of the Tariff Act of 1930

would be "inconsistent with the General Agreement on Tariffs and Trade").  See also NTN

Bearing, 74 F.3d at 1208 (citations omitted); Guangdong Wireking Housewares & Hardware Co.

v. United States, 37 CIT 319, 325, 900 F. Supp. 2d 1362, 1370 (2013), aff'd, 745 F.3d 1194 (Fed.

Cir. 2014)) (noting the remedial nature of antidumping duties is "well established").

Moreover, the revised translation ZMC submitted was simple, limited, and only consisted

of changes to a few words.  See Aug. Submission at 3.  It did not resemble cases in which the

courts have sustained Commerce's decisions to reject more complex submissions.  See e.g.,

Shandong Jinxiang Zhengyang Imp. & Exp. Co. v. United States, 44 CIT __, __, 29 F. Supp. 3d

1373, 1379 (2020) ("Substantial record evidence demonstrates that Zhengyang failed to provide

legible translations . . . and instead attempted to make an untimely submission of factual

information in the form of modified, re-translated, or reorganized exhibits and tables." (internal

quotation marks and citations omitted)); Mid Continent Steel & Wire, Inc. v. United States, 41

CIT __, __, 203 F. Supp. 3d 1295, 1313–14 (2017) (Respondent "provided [a] timely submission

of the partially translated" document and "could have submitted a fully translated [] statement but

chose not to do so within the deadline.").  Therefore, in this case, the Government's concern that

accepting corrective information would "undermine the integrity," Def.'s Br. at 28, of Commerce's

process fails to outweigh the concern that, by rejecting potentially corrective translations of a few

words, Commerce is applying punitive rather than remedial antidumping duties to ZMC.  The

court therefore rejects this policy argument.

In conclusion, the court finds that the revised translation in ZMC's August Submission was

corrective information and that Commerce's rejection of it was an abuse of discretion.

**II.      ZMC Has Failed To Exhaust Administrative Remedies as to its Claims Regarding Commerce's NME Status Memo but not Union Membership of the ESOC Members or ESOC Member Capital Contributions.**

Before a respondent can challenge a determination made by Commerce, 28 U.S.C. §

2637(d) states that the "Court of International Trade shall, where appropriate, require the

exhaustion of administrative remedies." See also 19 C.F.R. § 351.309(c)(2). Respondents can

meet this requirement with a "presentation of all issues and arguments in a party's administrative

case brief" to Commerce. Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010)

(citing 19 C.F.R. § 351.309(c)(2)); see also Luoyang Bearing Corp., v. United States, 44 CIT __,

__, Slip Op. 20-78 at 9–10 (June 1, 2020). Respondents do not meet exhaustion requirements "by

merely mentioning a broad issue without raising a particular argument[;] [however,] plaintiff's

brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable

clarity and avails the agency with an opportunity to address it." Timken Co. v. United States, 26

CIT 434, 460, 201 F. Supp. 2d 1316, 1340–41 (2002) ("Timken Co.") (citing Hormel v.

Helvering, 312 U.S. 552 (1941); Rhone Poulenc, 899 F.2d at 1191).

   The court may exercise discretion to excuse a respondent from this exhaustion requirement

in certain narrow circumstances. See 28 U.S.C. § 2637(d) (requiring exhaustion only "where

appropriate"). Examples of these narrow circumstances include when the respondent can

demonstrate that raising the issue before the agency would have been futile and when the issue is

purely a question of law. Itochu Bldg. Prods. v. United States, 733 F.3d 1140, 1146 (Fed. Cir.

2013); Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007); see also Zhongce

Rubber Grp. Co. v. United States, 42 CIT __, __, 352 F. Supp. 3d 1276, 1279–80 (2018), aff'd,

787 F. App'x 756 (Fed. Cir. 2019). Although the futility exception exists where parties would

otherwise be required to "go through obviously useless motions . . . [t]he mere fact that an adverse

decision may have been likely does not excuse a party from a statutory or regulatory requirement

that it exhaust administrative remedies." Corus Staal, 502 F.3d at 1379 (citations omitted). Other

exceptions to the exhaustion requirement are when a subsequent court decision might affect the

agency's decision or when the respondent had reason to believe the agency would not follow

precedent.  Luoyang Bearing Factory v. United States, 26 CIT 1156, 1186, 240 F. Supp. 2d 1268,

1297 (2002).

> ### A.      *ZMC Did Not Exhaust Administrative Remedies for its Claims Countering Commerce's Conclusions from the NME Status Memo Regarding GOC Control of Labor Unions.*

ZMC argues that Commerce's NME Status Memo does not show that the GOC controls

the ACFTU, and in turn, Sunny's labor union, because the NME Status Memo's analysis

concerned the GOC's ability to influence wage bargaining through the ACFTU and not union

activity in general.  Pl.'s Br. at 25–27.  The Government counters that ZMC has failed to exhaust

administrative remedies for this claim as required by 28 U.S.C. § 2637(d) because Commerce

noted the ACFTU's control over labor unions in its Preliminary Results and ZMC failed to contest

that claim in its Revised Brief.  Def.'s Br. at 14–16.

In its answers to the court's questions, ZMC notes two occasions where it mentioned the

NME Status Memo.  Pl.'s Suppl. Answers at 1–2.  It also raises these in its Reply Brief:

> ZMC challenged the Department's reliance on its NME Status Memo and
> specifically argued that the presumption of the Chinese government's control of
> Sunny's labor union was flawed . . . . ZMC Case Brief at 2.
>
> . . .
>
> ZMC specifically noted the flaw in the NME Status Memo assertion that the
> Chinese government favored management over ordinary workers and
> management dominates and controls trade unions . . . . ZMC Case Brief at 10.

Pl.'s Reply. at 3–4.  The court addresses each of these mentions in turn to analyze whether ZMC

has "merely mention[ed] a broad issue" or has if it has "rais[ed] a particular argument" to alert

Commerce "to the argument with reasonable clarity and avails the agency with an opportunity to

address it."[6]  Timken Co., 201 F. Supp. 2d at 1340–41 (citations omitted).

---

[6] ZMC notes five other mentions where it claims it made arguments that sufficiently exhausted administrative remedies.  See Pl.'s Reply at 3–4.  Two of these mentions, however, refer neither to the NME Status Memo nor to a connection between the GOC and any other group, so the court does not analyze them.  The other three mentioned in ZMC's Reply Brief are:

> ZMC demonstrated that the alleged connection between the Chinese government's control over all unions through the ACFTU and the ACFTU's role of controlling Sunny's union was not possible . . . . ZMC Case Brief at 4–5.

> The three Sunny directors . . . were all not affiliated with any level of the Chinese government and did not hold any position with . . . any . . . labor union.  ZMC Case Brief at 6.

> ZMC explained that there was "no organizational affiliation, let alone subordination, between the ESOC and Sunny's labor union or any level of Chinese government."  ZMC Case Brief at 8.

Pl.'s Reply at 3.

ZMC claims the first mention above implicates the connection between the GOC, the ACFTU, and all unions, including Sunny's.  Pl.'s Reply at 4.  The claims in ZMC's Revised Case Brief, however, implicate direct connections between the GOC and individuals that either chose Sunny's management or the managers themselves, and not connections between the GOC, the ACFTU, and the labor union.  This mention does not directly address ZMC's present argument that the NME Status Memo does not sufficiently support Commerce's finding that the GOC influences all labor union activity through the ACFTU.  Simply claiming that none of the ESOC members are also members of the ACFTU likewise does not implicate the particular argument regarding conclusions drawn from the NME Status Memo, nor would Commerce have been able to address that argument based on this mention in the Revised Case Brief.  Consequently, this mention fails to exhaust administrative remedies for the ZMC Status Memo claim.

ZMC argues the next two mentions above also gave Commerce the opportunity to address the claim about the NME Status Memo.  Pl.'s Reply at 2–3.  Like the first mention above, however, these claims merely address direct connections with the GOC and are, at best, "broad mention[s]" that the ESOC, Sunny, and Sunny's labor union are not connected to the GOC.  Timken Co. v. United States, 26 CIT 434, 460, 201 F. Supp. 2d 1316, 1340 (2002).  Because ZMC fails to make a "presentation of all issues and arguments" related to the lack of GOC influence, including the claim that the NME Status Memo is an insufficient basis for the relationship Commerce found between the GOC and all labor unions, these mentions also fail to exhaust administrative remedies.  Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010).

ZMC's first mention of the NME Status Memo in its Revised Case Brief is in a recitation

of Commerce's Preliminary Decision Memo where ZMC notes, "relying on its China Non-Market

Economy ('NME') Status Memo, the Department found Sunny's labor union to be government

controlled . . . ."   Revised Case Brief at 2 (footnotes omitted).   While ZMC did mention

Commerce's reliance on its NME Status Memo, ZMC follows this mention with only a summary

discussion of how the ESOC, and not the labor union, exercises majority shareholder rights over

Sunny.  Id.  Aside from a simple mention that Commerce relied on its NME Status Memo, ZMC

does not discuss the connection between the GOC and the ACFTU that it now claims is more

limited than Commerce suggests.   Pl.'s Br. at 25–28.   This first mention raises no particular

argument that would have alerted Commerce to ZMC's present claim that Commerce's

dependence on the NME Status Memo is flawed, and therefore ZMC failed to exhaust

administrative remedies as to this argument.   See Timken Co., 201 F. Supp. 2d at 1340–44

(citations omitted).

As to the second mention, ZMC claims that it "specifically noted the flaw in the NME

Status Memo assertion that the Chinese government favored management over ordinary workers

and management dominates and controls trade unions."   Pl.'s Reply at 3; see also Pl.'s Suppl.

Answers at 1 (citing Revised Case Brief at 9).   ZMC's Revised Case Brief states,

> According to the Department's China NME Status Memo, the Chinese government
> favors management over ordinary workers and management dominates and
> controls trade unions.  If Sunny's ESOC were controlled by management, one
> would expect employees with union positions to dominate the ESOC membership
> as well as ESOC Council.  However, that is not the case.

Revised Case Brief at 9 (citing NME Status Memo at 26).  Via footnote, ZMC continues, "[t]he

China NME Status Memo found that the Chinese government favors management over ordinary

workers, causing the former to 'largely dominate and control trade unions.'" Id. at n.64 (quoting

NME Status Memo at 26).

This mention does raise this issue: if the GOC had control over the ESOC in a manner the

NME Status Memo suggests, then union members with union positions would dominate the ESOC.

The mention fails, however, to take direct issue with the NME Status Memo itself as ZMC now

does. Instead, it relies on the NME Status Memo to claim that, because the ESOC and its Council

are not dominated by union leaders, the GOC conversely must not be controlling the ESOC and

therefore Sunny and ZMC. ZMC claims this mention challenges the validity of the NME Status

Memo's assertions. Pl.'s Suppl. Answers at 1. However, ZMC makes this particular claim in the

context of arguing the ESOC and the labor union are not connected to the GOC. Revised Case

Brief at 8–9. ZMC does not expand on this claim to form the argument it now raises that the NME

Status Memo is an insufficient basis for Commerce's conclusion that the GOC controls all labor

union activities. See Pl.'s Br. at 25–28. In fact, in its Revised Case Brief, ZMC seems to rely on

the "Trade Unions and Collective Bargaining" section of the NME Status Memo as an authority

to support its own conclusions, whereas now it claims that section is inappropriate for Commerce

to use as a basis for its conclusions. Pl.'s Br. at 26–28. Because ZMC did not make a "presentation

of all issues and arguments in [its] administrative case brief" related to its critique of Commerce's

use of its NME Status Memo, here too it failed to exhaust administrative remedies as to that claim.

Dorbest Ltd., 604 F.3d at 1375.

Neither of the mentions regarding the NME Status Memo that ZMC now claims were

sufficient to exhaust administrative remedies actually do so. Even taken together, these mentions

from the Revised Case Brief do not "alert[] the agency to the argument with reasonable clarity and

avail[] the agency with an opportunity to address it." Timken Co., 201 F. Supp. 2d at 1340–41.

Nor has ZMC addressed the claim related to the NME Status Memo conclusions in a manner as specific as previous respondents where courts have found plaintiffs exhausted administrative remedies.   See Itochu Bldg., 733 F.3d at 1143, 1146–48 (holding a respondent exhausted administrative remedies because "it set forth its position in comments, met with eight department officials to discuss the issue, and submitted legal support for its position").   For the same reason, ZMC's claim that it repeatedly addressed the single, broad "material issue" in this case -- whether ZMC sufficiently rebutted the presumption of government control -- is unpersuasive.   Pl.'s Suppl. Answers at 2, 8 (quoting Def.'s Answers at 13); see also Dorbest Ltd., 604 F.3d at 1375 (noting a respondent can meet the administrative exhaustion requirement through a "presentation of all issues and arguments").

Because ZMC, in its Revised Case Brief, failed to raise the criticisms it now raises -- concerning Commerce's reliance on its NME Status Memo in the Preliminary Results -- the court finds ZMC has failed to exhaust administrative remedies as required in 28 U.S.C. § 2637(d).

> **B.      The Court Will Not Exercise its Discretion To Excuse ZMC from the Exhaustion Requirement for its Claim Regarding Commerce's NME Status Memo.**

ZMC argues that if it failed to exhaust administrative remedies, the court should excuse the requirement because the invocation of the doctrine requires "it serve some practical purpose when applied."  Pl.'s Reply at 5 (citing Itochu Bldg., 733 F.3d at 1145).  ZMC claims that invoking the doctrine here would serve none of its intended purposes, set forth in Public Citizen Health Research Group v. Commissioner, FDA, 740 F.2d 21, 29 (D.C. Cir. 1984)).  See Pl.'s Reply at 5. ZMC notes Public Citizen presents four primary purposes for the doctrine: (1) ensuring respondents do not flout administrative processes; (2) protecting autonomy of agencies to make

decisions; (3) developing relevant issues to aid judicial review; and (4) serving interests of judicial economy.  Id.

Requiring administrative exhaustion here, however, fits several of the practical purposes of the doctrine.  First, ZMC claims that it "did not flout the Department's established administrative processes and try to raise arguments for the first time"; yet as discussed above, it did not raise the issue previously with sufficient clarity to exhaust administrative remedies.  Pl.'s Reply at 5.  Second, in this case administrative exhaustion requires respondents to raise criticisms of how Commerce bases its Preliminary Results on its own evidence -- including NME Status Memos -- to Commerce before raising them to the court, thereby protecting Commerce's "interest in being the initial decisionmaker" when evaluating criticism to its own reports.  Itochu Bldg., 733 F.3d at 1145 (citation omitted).  Third, had ZMC raised this argument and prompted a response from Commerce, it would have more fully developed a record for the court.  Id.  Cf. Corus Staal, 502 F.3d at 1380 ("[R]equiring Corus to set forth its factual and legal arguments in detail in its case brief would have had potential value . . . by . . . providing the agency an opportunity to set forth its position in a manner that would facilitate judicial review.").  Finally, had Commerce admitted it had made an error in its Preliminary Results based on this criticism, such an occurrence would have promoted judicial efficiency.  Itochu Bldg., 733 F.3d at 1145 (citation omitted).

ZMC's claim that the futility exception for administrative exhaustion applies is unpersuasive.  Pl.'s Answers at 7–8.  Even if "Commerce in both the preliminary and final determination, and now here before this Court, presents the same explanation as to why it denied ZMC's separate rate status," Pl.'s Answers at 8, it does not excuse ZMC's requirement to exhaust administrative remedies because "[t]he mere fact that an adverse decision may have been likely

does not excuse a party from a . . . requirement that it exhaust administrative remedies," Corus Staal, 502 F.3d at 1379 (citation omitted).  Cf. Itochu Bldg., 733 F.3d at 1144 (citation omitted).[7]

Therefore, the court will not use its discretion to excuse the administrative exhaustion requirement for ZMC's present claim regarding the inadequacy of the NME Status Memo for Commerce's finding that the GOC controls labor union activity.  Because ZMC failed to exhaust its administrative remedies as to this argument, and no judicial exception to the requirement is warranted here, the court will not consider ZMC's argument.

### C.    *ZMC Did Exhaust Administrative Remedies for its Claim that the Record Does Not Support Commerce's Finding that All ESOC Members Are Labor Union Members.*

ZMC argues the evidence on the record is insufficient to support Commerce's finding that all ESOC members were also members of Sunny's labor union, Pl.'s Br. at 23, which Commerce deems relevant to its final determination, IDM at 11.  The Government argues that ZMC failed to exhaust administrative remedies as to this claim as well.  Def.'s Br. at 14–16.  ZMC again responds that it did not fail to exhaust administrative remedies as to this claim.  Pl.'s Reply at 2–4.

This claim is related to the issue discussed above regarding whether Commerce's rejection of the revised translation in ZMC's August Submission for untimeliness was proper.  In that submission, ZMC did specifically raise evidence to counter the original translation that Commerce

---

[7] The other the "specific narrow circumstances" where it may be appropriate to excuse administrative exhaustion requirements also do not apply.  Luoyang Bearing Corp. v. United States, 44 CIT __, __, Slip Op. 20-78 at 4 (June 1, 2020).  ZMC admits that it is "not asserting that this is a 'pure question of law;'" therefore, that exception also does not apply.  Pl.'s Reply at 6 (quoting Def.'s Br. at 14); see also Itochu Bldg. Prods. v. United States, 733 F.3d 1140, 1146 (Fed. Cir. 2013) (citation omitted).  Moreover, ZMC does not point to subsequent court decisions that might have affected Commerce's decision, nor does ZMC claim it had reason to believe the agency would not follow precedent in making certain conclusions from its NME Status Memo.  See Luoyang Bearing Factory v. United States, 26 CIT 1156, 1186 n.26, 240 F. Supp. 2d 1268, 1297 (2002).

used as a basis for its finding that all ESOC members were also union members, and ZMC claimed

Commerce "should rely on [the] correct translation." Aug. Submission at 3. Assuming that the

rejection of the revised translation was improper, then this argument in the August Submission

alone should have alerted Commerce to ZMC's argument that the administrative record was

insufficient for a finding that all ESOC members were union members. See Timken Co., 201 F.

Supp. 2d at 1340–41.

Moreover, ZMC repeatedly raised the argument that the ESOC was independent of the

labor union in its Revised Case Brief. It notes, for instance, that: (1) "the labor union has no

authority to exercise ESOC's shareholder rights," Revised Case Brief at 3; (2) that "[o]nly a single

ESOC member has a position with Sunny's labor union," id. at 4; and (3) that "[t]he ESOC is

organized and acts independently from the company's labor union," id. at 7. These statements

availed Commerce of the opportunity to address the argument that the ESOC's members operate

independently from the labor union, which Commerce did in its Final Results, replying that the

ESOC members "are all members of Sunny's labor union." IDM at 11. Therefore, ZMC did not

fail to exhaust administrative remedies as to its present claim that Commerce's "conclusion that

all Sunny ESOC members were members of Sunny's labor union [is] factually unsupported by the

record . . . ." Pl.'s Br. at 23.

The court, therefore, will consider ZMC's arguments regarding ESOC membership in the

labor union and Commerce's related conclusions regarding labor union control.

> **D.     *ZMC Did Exhaust Administrative Remedies for its Argument Regarding Capital Contribution of ESOC Members.***

At oral argument and in its answers to the court's supplemental questions, ZMC argued

"[t]he twenty individuals who comprise the ESOC and who did pay money for the Sunny shares

are the actual shareholders who are entitled to vote at Sunny shareholder general meetings." Pl.'s Suppl. Answers at 3. The Government argued that this argument "was not raised before Commerce and thus cannot be raised now." Def.'s Suppl. Answers at 6 (citation omitted).

ZMC did present evidence before Commerce's <u>Final Results</u> that supports this argument. It raised evidence that shareholders exercise voting rights in proportion to their capital contribution. <u>See</u> Oct. Submission at Ex. 1 (listing Article 17 of Sunny's Articles). It also listed the individual shareholdings of each of the ESOC members in its May Submission. <u>See</u> May Submission at Ex. 6. Based on this evidence, ZMC noted: (1) "Sunny is ultimately owned by . . . Sunny's individual employees, <u>id.</u> at 4; (2) "[t]he total direct shareholding of these twenty individual shareholders is [[        ]]," <u>id.</u> at 5; and that (3) "Sunny is majority owned by its employees," <u>id.</u> at 5. Furthermore, ZMC noted that "[t]he employee stock ownership committee benefits and strengthens the individual shareholders' majority rights and controls over Sunny." <u>Id.</u> ZMC's Revised Case Brief cites this mention for a claim that the ESOC represents shareholders and "protect[s] and promote[s] the interests of Sunny's private employees." Revised Case Brief at 3.

ZMC then provided more than a single, "brief statement of the argument" that the individual members of the ESOC that owned Sunny shares controlled Sunny's shareholder rights. Since it follows that the shares those individuals own, which ZMC provided for each individual, are "in proportion to their capital contribution," Oct. Submission at Ex. 1, Commerce was alerted "to the argument with reasonable clarity and avail[ed] . . . with an opportunity to address it." <u>Timken Co.</u>, 201 F. Supp. 2d at 1340–41 (citation omitted). Since Commerce had the opportunity to address this argument and these facts before its <u>Final Results</u>, ZMC exhausted administrative remedies as to this claim. The court, therefore, will consider this argument.

### III.    Commerce's Reasoning in its Final Determination Is Not Supported by Substantial Evidence on the Record.

ZMC argues Commerce's <u>Final Results</u> are unsupported by substantial evidence because the GOC lacks the potential to influence Sunny.  ZMC contends: (1) Sunny's union lacked structure to be controlled; (2) the ESOC actually controls Sunny; and (3) record evidence does not support that all ESOC members are union members.  Pl.'s Reply at 8–9, 11, 19.  The Government responds that (1) the labor union "maintains the potential to exercise" control over Sunny and ZMC, regardless of the ESOC, Def.'s Br. at 17; and (2) Commerce's finding that all ESOC members are union members is only relevant to, but not necessary for, the <u>Final Results</u>, <u>id.</u> at 19–20.

Commerce determined in its IDM that ZMC failed to rebut the presumption of de facto government control because: (1) the GOC can control Sunny's labor union through the ACFTU; (2) the labor union has the potential to control selection of Sunny's management; and (3) the ESOC that ZMC claims exercises majority shareholder rights is connected to the labor union.  <u>See</u> IDM at 11–12.  Below, the court addresses each of these basic components of Commerce's determination.

### A.    Substantial Evidence Supports Commerce's Finding that the GOC Has the Ability To Control Sunny's Labor Union through the ACFTU.

ZMC argues the record does not support Commerce's conclusions that the GOC influences all labor union activities through the ACFTU, Pl.'s Br. at 25–28, and that the ACFTU can influence Sunny's labor union, <u>id.</u> at 14–16.  As discussed above, ZMC claims that the NME Status Memo upon which Commerce relies is an insufficient basis for Commerce's conclusion that the GOC controls all union activities through the ACFTU.  <u>See</u> Pl.'s Br. at 25–28.

In addition to its administrative exhaustion argument, Def.'s Br. at 14–16, the Government maintains the GOC-affiliated ACFTU has a "legal monopoly" on Sunny's labor union according to Chinese law, id. at 18–19.  See also IDM at 12–13 (quoting NME at 21).  The Government further argues that the NME Status Memo does support Commerce's conclusion and that it is the only relevant information on the record.  Def.'s Br. at 20–23 (citing NME Status Memo at 20–23).  ZMC concedes that it did not offer evidence to show the ACFTU did not control all labor union activity, but instead argues the ACFTU could not have controlled Sunny's labor union because the labor union lacked any structure that could be controlled.  Pl.'s Reply at 13–15.

"[I]f a reasonable mind might accept the evidence as sufficient to support" Commerce's conclusions, then substantial evidence supports the conclusions.  Maverick Tube Corp., 857 F.3d at 1359 (citation omitted).  "[E]ven if there is some evidence that detracts from [Commerce's] conclusion," if the conclusion is supported by the administrative record as a whole, it is supported by substantial evidence.  Shandong Huarong Gen. Corp. v. United States, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001) (citation omitted), aff'd sub nom., Shandong Huarong Gen. Grp. Corp. v. United States, 60 F. App'x 797 (Fed. Cir. 2003).  Substantial evidence may also even support a conclusion if "there is a 'possibility of drawing two inconsistent conclusions from the evidence.'" Aluminum Extrusions Fair Trade Comm. v. United States, 36 CIT 1370, 1373, 34 ITRD 2119 (2012) (quoting Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).

First, the court need not consider ZMC's argument here -- that the NME Status Memo is an insufficient basis to conclude the GOC controls unions through the ACFTU -- because ZMC failed to exhaust administrative remedies as to that argument.  See Section II.A., supra.  Moreover, the NME Status Memo itself provides substantial evidence for Commerce's finding, as it states: (1) the ACFTU has a "legal monopoly on all trade union activities;" (2) "[t]he Chinese government

prohibits independent unions;" and (3) the ACFTU "preside[s] over a network of subordinate trade unions."  NME Status Memo at 21 (citing to <u>Trade Union Law of the People's Republic of China</u>, Article 4, 9–10 (adopted by the National People's Congress on Apr. 3, 1992, amended Oct. 27, 2001, further amended Aug. 27, 2009)); <u>see also</u> May Submission at 105–07 (explaining that Chinese law states "[l]abor unions must . . . uphold . . . the leadership of the Chinese Communist Party," that "the establishment of any grassroots labor union . . . must be reported to the immediately superior labor union organization for approval," and that the "[h]igher level labor unions may dispatch their members to assist and provide guidance to enterprise employees in organizing . . . labor unions.").  The NME Status Memo further states that the GOC controls the ACFTU because union leaders hold Chinese Communist Party or government offices.  NME Status Memo at 21.

Accepting the NME Status Memo as accurate because of a lack of contradictory evidence, it provides a substantial amount of evidence that the GOC controls or at least has the potential to control all union activity.  Because this amount of evidence is enough such that "a reasonable mind might accept [it] as sufficient" for Commerce's conclusion that the GOC can control union activity through the ACFTU, that conclusion is supported by substantial evidence.  <u>Maverick Tube Corp.</u>, 857 F.3d at 1359 (citation omitted).

ZMC's second argument -- that the labor union lacks any structure on the record that the ACFTU could influence -- is unpersuasive.  Unlike the first argument, there is no administrative exhaustion concern with this argument, because here ZMC is simply pointing to a lack of evidence on the administrative record of the labor union's structure.  Pl.'s Br. at 14; <u>see also</u> Def.'s Br. at 12 (not claiming ZMC failed to exhaust administrative remedies with respect to this argument).  Admittedly, there is a paucity of information concerning the structure or operations of the labor

union beyond that the labor union: (1) is a nominal shareholder, Pl.'s Br. at 20; (2) is registered with the ACFTU, id. at 6; (3) is a legal person, id.; and (4) has a leader, id. at 14.  However, two possible inferences can be drawn from what is available.  ZMC's conclusion from the evidence seems to indicate that the labor union is nothing more than a proxy and an organization that exists only on paper.  See id. at 14–16; Pl.'s Reply at 13–14.  Commerce concludes the opposite, that the labor union is at least substantial enough to have "union activity" that the ACFTU must approve and can control.  IDM at 12.

Even though these conclusions conflict, Commerce's is nonetheless supported by substantial evidence such that a reasonable mind might accept it to support Commerce's conclusion.  See Aluminum Extrusions, 36 CIT at 1373; Maverick Tube Corp., 857 F.3d at 1359 (citation omitted).  Commerce explains that the "labor union is governed by the Labor Union Law of the People's Republic of China and is registered before the Zhejiang Federation of Trade Unions, a local branch of the AFCTU [sic]."  IDM at 9 (citing May Submission at 7).  The Labor Union Law that governs Sunny's labor union supports Commerce's characterization, requiring labor unions to "to protect . . . [the] interests of," "mobilize," "organize," and "educate employees." May Submission at 106.  It follows that, since Sunny's labor union is registered and approved by a superior labor union, it has an organization capable of meeting those responsibilities and "upholding[ing] . . . the Chinese Communist Party."  Id.  It is unlikely that a labor union would have been approved to be registered, especially after the "verification" process identified on its Registration Certificate, if that union's only purpose was to exist as a paper proxy for an organization not allowed legal personhood.  May Submission at 102.

Moreover,  [[

]] is sufficient structure for the ACFTU to exert its

influence.  See id.; Pl.'s Br. at 5; see also May Submission at 118 (Article 38 of the General

Principles of the Civil Law of the PRC states "the responsible person who acts on behalf of the

legal person in exercising its functions and powers shall be its legal representative.").  Because of

these positions and because of the requirements of labor unions for approval by superior unions,

Commerce's conclusion that the labor union has sufficient activity to be influenced by the ACFTU

is also supported by substantial evidence.  ZMC, which has the burden of rebutting the presumption

of government control, only pointed to a lack of evidence instead of raising evidence to the

contrary; it did not provide evidence that "fairly detract[ed] from [the] weight" of the substantial

evidence on the record.  CS Wind Vietnam Co. v. United States, 832 F.3d 1367, 1373 (Fed. Cir.

2016) (quoting Gerald Metals, Inc. v. United States, 132 F.3d 716, 720 (Fed. Cir. 1997)); see

Sigma Corp., 117 F.3d at 1405–06.

Because substantial evidence on the record supports Commerce's conclusions that the

GOC can control labor union activity through the ACFTU and that Sunny's labor union had

sufficient activities that the ACFTU could influence, this first logical step for Commerce's Final

Results is supported by substantial evidence.

> **B.** **Commerce Did Not Sufficiently Explain How the Labor Union Has the
> Potential To Exercise Majority Shareholder Rights in Light of Evidence
> Supporting the ESOC's Ability To Do So.**

As discussed above, Commerce has adequately established GOC influence through the

ACFTU to the labor union.  It is plausible then that, if the labor union actually had the potential to

control the majority of Sunny's shares, there could exist a "rational connection between the facts

found and the choice [Commerce] made," Burlington Truck Lines v. United States, 371 U.S. 156,

168, (1962), that "a reasonable mind might accept the evidence as sufficient to support the

finding," Maverick Tube, 857 F.3d at 1359.  Below the court addresses whether Commerce has

"articulate[d] a satisfactory explanation for" this key step in its analysis.  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

Although the responsibility to rebut the presumption of government control lies with the respondent, Yantai CMC Bearing, 203 F. Supp. 3d at 1322 (citing AMS Assocs., 719 F.3d at 1379), the court must analyze whether Commerce has responded appropriately to the respondent's arguments.  See, e.g., Itochu Bldg. Prods., Co. v. United States, 40 CIT __, __,163 F. Supp. 3d 1330, 1337 (2016); Aluminum Extrusions, 36 CIT at 1373; Asociacion Colombiana de Exportadores de Flores v. United States, 12 CIT 1174, 1177, 704 F. Supp. 1068, 1071 (1988). Pursuant to 19 U.S.C. § 1677f(i), Commerce is required "in antidumping and countervailing proceedings [to] address 'relevant arguments,'" including those "material to the agency's determination . . . ."  Timken U.S. Corp. v. United States, 421 F.3d 1350, 1354 (Fed. Cir. 2005) ("Timken U.S. Corp.") (citations omitted).  Specifically, 19 U.S.C. § 1677f(i)(3)(B) requires that Commerce "shall include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties . . . ."

In its IDM, Commerce explains that it "would expect that a majority shareholder . . . to have the ability to control . . . the selection of management," IDM at 8, and in other instances claims that "as the majority shareholder, Sunny's labor union has the inherent ability to . . . appoint board members," id. at 11.  The focal point of ZMC's response, both in its administrative brief and its briefs to the court, was that the ESOC, and not the labor union, actually exercised the majority shareholder rights.  See Revised Case Brief at 1; Pl.'s Br. at 17.  Moreover, ZMC noted at oral argument and in its responses to the court's supplemental questions that the individuals who each owned a percentage of Sunny's shares actually controlled Sunny.  Pl.'s Suppl. Answers at 3 (citing May Submission at Ex. 6).  The evidence ZMC presents detracts from Commerce's expectation

about the abilities of parties nominally listed as majority shareholders.  See CS Wind Vietnam,

832 F.3d at 1373.  Moreover, as the focal point of ZMC's response, Commerce is required to

respond to this argument, as it is both relevant and material to its determination.  See 19 U.S.C. §

1677f(i)(3)(B); Timken U.S. Corp., 421 F.3d at 1354; Asociacion Colombiana de Exportadores de

Flores, 704 F. Supp. at 1071.

      The Government argues that Commerce's explanation in its IDM was adequate because

"potential control . . . is, for all intents and purposes, actual control" and Commerce explained the

labor union had "the ability to control" Sunny.  Def.'s Br. at 24 (quoting An Giang Fisheries Imp.

& Exp. Joint Stock Co. v. United States, 42 CIT __, __, 284 F. Supp. 3d 1350, 1359 (2018)); see

also IDM at 11.  The Government further argues that ZMC's claim that the ESOC actually

exercises majority shareholder rights "disregards this case law" and improperly advocates that only

actual exercise be established.  Id.

      In its latest brief, ZMC claims Commerce has repeatedly failed to address the argument

that the ESOC exercises majority shareholder rights and effectively controls Sunny, and that

Commerce has created an "irrebuttable presumption" of government control that contradicts

Commerce's prior precedent.  Pl.'s Reply at 7; see also Diamond Sawblades Mfrs., 866 F.3d at

1311 ("[W]e consistently have sustained Commerce's application of a rebuttable presumption of

government control.").

      ZMC is correct in claiming Commerce failed to adequately address the argument that the

labor union cannot exercise majority shareholder rights because the ESOC does.  Although the

caselaw supports the sufficiency of the "potential control" standard, ZMC claimed that the labor

union does not have even the potential to control Sunny because the labor union "has no ability . .

. to exercise[] legal authority or control over shareholder rights" by virtue of the ESOC's activities.

Revised Case Brief at 10.  Commerce does not directly address this argument that is adverse to its own determination.  Instead of explaining how the labor union could go about expressing its majority shareholder rights in light of the ESOC, either legally or through other means, Commerce simply repeats the reasoning in the Preliminary Decision Memo in its <u>Final Results</u>.  <u>See</u> Preliminary Decision Memo at 8; IDM at 8 ("As we explained in the <u>Preliminary Results</u> . . . where a government entity holds a majority equity ownership . . . [it] means that the government exercises, or has the potential to exercise, control over the company's operations.")  In the <u>Diamond Sawblades</u> proceedings, it was more apparent how the state-owned enterprise that held a majority share had the potential to control the respondent whereas here, the respondent claims a government-affiliated majority shareholder actually lacks any potential to control the respondent.  <u>See</u> <u>Advanced Tech. & Materials Co. v. United States,</u> 37 CIT 1487, 938 F. Supp. 2d 1342, 1345 (2013), <u>aff'd</u>, 581 F. App'x 900 (Fed. Cir. 2014).  Because ZMC makes the relevant argument that its situation is not one in which "the majority shareholder can typically control the operations of a company," <u>An Giang Fisheries</u>, 284 F. Supp. 3d at 1359, contrary to what Commerce "would expect," IDM at 10, Commerce should address it.  Moreover, even in the <u>Diamond Sawblades</u> proceedings, Commerce eventually explained how the state-owned enterprise had the potential to exercise government control over the respondent's management and its decision was then upheld.  <u>See</u> <u>Advanced Tech.</u>, 938 F. Supp. 2d at 1345.

    Because Commerce failed to address ZMC's relevant and material argument regarding the labor union's inability to control majority shareholder rights, Commerce did not meet the requirements in 19 U.S.C. § 1677f(i)(3)(B) and failed to explain its determination with sufficient clarity.  <u>See</u> <u>Timken U.S. Corp.</u>, 421 F.3d at 1353 ("[A]n agency must explain its action with

sufficient clarity to permit 'effective judicial review.'" (quoting Camp v. Pitts, 411 U.S. 138, 142–

43 (1973))).  Therefore, the court remands this issue to Commerce for further explanation.

> ### C.    *Commerce's Conclusion That All ESOC Members are Also Labor Union Members Is Not Supported by the Evidence.*

The final logical component of Commerce's explanation of its Final Results is whether the

ESOC and the labor union are connected.  If they are, since ZMC claims the ESOC actually

exercises majority shareholder rights, this may support a finding of potential government control.

In its Revised Case Brief, ZMC argued the ESOC is independent from the labor union.

Revised Case Brief at 7.  Commerce responded that "individual owners of Sunny's ESOC are all

labor union members."  IDM at 11 (referring to the original translation of the ESOC Articles).

Although the Government argues Commerce's ultimate conclusion does not depend on this

finding, Commerce nonetheless did consider this finding as "relevant," and presented it as only

one of two responses to ZMC's argument that the ESOC and labor union are unconnected.  Id.;

see Def.'s Br. at 20 n.2.  ZMC claims, however, that this assertion is based on the incorrect

translation that it attempted to correct.  Pl.'s Reply at 20.

As discussed above, Commerce improperly rejected the revised translation in ZMC's

August Submission.  Had Commerce not rejected the revised translation, it could have met its

responsibility to "examine the relevant data and articulate a satisfactory explanation for" deciding

which translation to choose.  Motor Vehicle Mfrs., 63 U.S. at 43.  Moreover, since ZMC essentially

made a relevant argument in submitting the revised translation that is adverse to Commerce's

Preliminary Results, Commerce should be required to address it for the same reasons stated above.

See 19 U.S.C. § 1677f(i)(3)(B); Timken U.S. Corp., 421 F.3d at 1354 (citations omitted); see also

Aluminum Extrusions, 36 CIT at 1373.

Since Commerce itself designates this argument as "relevant" to its analysis, it should be required to address the revised translation. The Government claims the finding that all members of the ESOC are also labor union members is not necessary to Commerce's overall conclusion. Def.'s Br. at 20; see also Asociacion Colombiana de Exportadores de Flores, 704 F. Supp. at 1071 (explaining whether Commerce is required to address an issue depends on if the final determination may be "sufficiently reviewed without specific discussion of the issue," among other considerations). However, Commerce itself lists this finding alongside what the Government now claims is Commerce's main claim and notes the ESOC Articles support this finding. IDM at 11. The Government's present argument that this finding is unimportant, then, is at best a post hoc rationalization that cannot be used to meet Commerce's responsibility to explain its determination. See Hoogovens Staal BV, 4 F. Supp. 2d at 1219 (citation omitted). Instead, because Commerce itself deems the finding as relevant to its determination, it should be required to address the revised translation. Timken U.S. Corp., 421 F.3d at 1354 (citations omitted) (holding that 19 U.S.C. § 1677f(i) "requires that issues material to the agency's determination be discussed.").

Therefore, the court remands to Commerce its determination to address the revised translation in ZMC's August Submission that contradicts its relevant finding or to otherwise explain whether the finding is actually necessary for its ultimate conclusion that ZMC failed to rebut the presumption of de facto government control.

## CONCLUSION

For the reasons discussed above, the court finds: (1) Commerce's rejection of ZMC's August Submission to be unsupported by substantial evidence and not in accordance with the law; (2) ZMC failed to exhaust administrative exhaustion requirements as to its argument that Commerce's NME Status Memo is an insufficient basis for the conclusion that the GOC controls

all labor activities through the ACFTU; (3) ZMC did not fail to exhaust administrative exhaustion requirements as to its arguments that ESOC members are not all labor union members and regarding the capital contributions of the ESOC members; (4) Commerce failed to adequately address how the labor union could exercise majority shareholder rights to control selection of management in light of the evidence concerning the ESOC's activities; and (5) Commerce failed to address the material issue that its finding -- that all ESOC members are members of the labor union, based on the original translation of the ESOC Articles -- could be incorrect.  Therefore, the court remands to Commerce its determination that ZMC failed to establish a lack of de facto government control over its activities to: (1) consider the revised translation; (2) address how the labor union had the potential to exercise majority shareholder rights in light of the ESOC; and (3) address how the revised translation impacts its analysis.  The court takes no position on the issue of whether, with more robust analysis, explanation, and consideration of the evidence, Commerce's determination may be supported by substantial evidence.  Commerce shall file with the court and provide to the parties its remand results within 90 days of the date of this order; thereafter the parties shall have 30 days to submit briefs addressing the revised final determination with the court, and the parties shall have 30 days thereafter to file reply briefs with the court.

     **SO ORDERED.**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated:  August 21, 2020
       New York, New York