# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ZHEJIANG MACHINERY IMPORT & EXPORT CORP., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant. | Before: Gary S. Katzmann, Judge <br> Court No. 19-00039 <br><br> *PUBLIC VERSION* |

## OPINION

[The court affirms Commerce's Remand Results.]

Dated: June 23, 2021

Adams C. Lee, Harris Bricken Sliwoski LLP, of Seattle, WA, for plaintiff.

Kelly A. Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With her on the confidential brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was Nikki Kalbing, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce of Washington, D.C. With them on the public version of the brief was John V. Coghlan, Deputy Assistant Attorney General of the Federal Programs Branch, delegated the functions and duties of the Acting Assistant Attorney General.

  Katzmann, Judge: The court returns to a case involving whether an exporter in a non-market economy ("NME") sufficiently established independence from government control to qualify for a separate antidumping ("AD") duty rate and whether nominal ownership of majority shareholder rights by a labor union may prevent a company from rebutting a presumption of government control. Before the court is Commerce's Final Results of Redetermination Pursuant to Court Remand (Dep't Commerce Nov. 19, 2020), ECF No. 46 ("Remand Results"), which the court ordered in Zhejiang Machinery Import & Export Corp. v. United States, 44 CIT __, 471 F.

Supp. 3d 1313 (2020) ("Zhejiang I"), so that Commerce could further explain its determination in Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2016–2017, 84 Fed. Reg. 6,132, 6,132–34 (Dep't Commerce Feb. 26, 2019), ("Final Results"). On remand, Commerce accepted previously rejected evidence, re-examined the record evidence related to the ability of the majority shareholder's government-affiliated labor union to control its activities, and continued "to find that [Plaintiff] failed to demonstrate an absence of de facto government control over its export activities and is therefore not eligible for a separate rate." Remand Results at 2. Plaintiff Zhejiang Machinery Import & Export Corporation ("ZMC"), an exporter of tapered roller bearings and parts thereof ("TRBs"),[1] continues to challenge Commerce's decision as unsupported by substantial evidence and otherwise not in accordance with law. Pl. ZMC's Cmts. on DOC's Remand Determination, Dec. 21, 2020, ECF No. 49 ("Pl.'s Br."). Defendant the United States ("Government") requests that the court sustain Commerce's Remand Results. Def.'s Resp. to Cmts. on Remand Redetermination at 1, Feb. 8, 2021, ECF No. 54 ("Def.'s Br."). The court affirms Commerce's Remand Results and enters judgment for the Government.

## BACKGROUND

The court set out the relevant legal and factual background of the proceedings in further detail in its previous opinion, Zhejiang I, 471 F. Supp. 3d at 1325–30. Information relevant to the instant opinion is set forth below.

In 2009, Commerce updated the AD duty rate on TRBs for the People's Republic of China to 92.84 percent, after first setting an AD duty on TRBs in 1987. See Tapered Roller Bearings and

---

[1] "TRBs are a type of antifriction bearing made up of an inner ring (cone) and an outer ring (cup). Cups and cones sell either individually or as a preassembled 'set.'" NTN Bearing Corp. of Am. v. United States, 127 F.3d 1061, 1063 (Fed. Cir. 1997).

Parts Thereof, Finished or Unfinished, from the People's Republic of China, 74 Fed. Reg. 3,987, 3,987–90 (Dep't Commerce Jan. 22, 2009) ("the Order"); Tapered Roller Bearings and Parts Thereof, Finished or Unfinished, from the People's Republic of China, 52 Fed. Reg. 22,667 (Dep't Commerce June 15, 1987). In June 2017, Commerce published a notice of opportunity to request review of the Order. Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation: Opportunity to Request Administrative Review, 82 Fed. Reg. 26,441, 26,441–44 (Dep't Commerce June 7, 2017).

As summarized in the court's previous opinion, during the review, ZMC applied for a separate rate and submitted details of its ownership structure. Zhejiang I, 471 F. Supp. 3d at 1327. ZMC stated it was entirely owned by its parent company, Zhejiang Sunny I/E Corp ("Sunny"). Id. ZMC further noted that Sunny, in turn, was owned by Zhejiang Province Metal & Minerals Import and Export Co., Ltd. and Sunny's labor union, with the labor union as majority owner. Id. Zhejiang Province Metal & Minerals Import and Export Co., Ltd., was fully owned by Zhejiang International Business Group Co., Ltd., whose complete owner was the Zhejiang Provincial State-owned Assets Supervision and Administration Commission ("SASAC") -- an entity within the Government of China ("GOC"). Id. ZMC also stated that Sunny's labor union was listed as the nominal owner of the majority of Sunny's shares in Sunny's Articles of Association ("Sunny's AoAs") because the ultimate owners of those shares were members of Sunny's employee stock ownership committee ("ESOC"), which is not allowed legal personhood under Chinese law and therefore could not be assigned shares. Id. Based on this information, Commerce preliminarily determined that ZMC failed to demonstrate that the GOC lacked de facto control over its export activities. See Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the

People's Republic of China: Preliminary Results and Intent to Rescind the Review in Part; 2016–2017, 83 Fed. Reg. 32,263, 32,263 (Dep't Commerce July 12, 2018) ("Preliminary Results").

ZMC then submitted a case brief that included, among other information, a revision of the original translation of the ESOC's Articles of Association ("ESOC Articles") it had provided to Commerce. Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Case Br. at 3 (Aug. 23, 2018), P.R. 241, C.R. 158 ("Aug. Submission"). This revised translation changed [[

]] whereas the original translation indicated [[                                              ]], Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Resubmission of Case Brief at Ex. 7 (Dec. 6, 2018), P.R. 255, C.R. 162. Commerce determined that the brief included untimely factual information, rejected it, and allowed ZMC the opportunity to submit a revised brief. 30th Administrative Review of Tapered Roller Bearings and Parts Thereof, Finished and Unfinished from the People's Republic of China: Rejection of Untimely-Filed New Factual Information (Dec. 3, 2018), P.R. 253. Commerce then published its Final Results on February 26, 2019, in which it maintained its decision that ZMC did not rebut the presumption of government control.

On March 25, 2019, ZMC initiated the instant litigation challenging Commerce's Final Results. Summons, ECF No.1; Compl., ECF No. 2. On August 21, 2020, the court concluded that "Commerce failed to meet its obligation to consider corrective information and provide a reasoned explanation for its determination." Zhejiang I, 469 F. Supp. 3d at 1330. Thus, the court remanded that conclusion to Commerce for further explanation. Id. at 1349. Commerce filed its Remand Results on November 19, 2020, concluding that Zhejiang was still not eligible for a separate rate

and "is part of the China-wide entity with a weighted-average dumping margin of 92.84 percent." Remand Results at 9.[2] Plaintiff Zhejiang filed comments on the Remand Results on December 21, 2020. Pl.'s Br. The Government replied in support of Commerce's redetermination on February 8, 2021. Def.'s Br.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(c). The standard of review in this action is set forth in 19 U.S.C. § 1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." The court also reviews the determinations pursuant to remand "for compliance with the court's remand order." See Beijing Tianhai Indus. Co. v. United States, 39 CIT __, __, 106 F. Supp. 3d 1342, 1346 (2015) (citations omitted).

## DISCUSSION

When AD duties apply to goods from an NME country, "Commerce presumes that all respondents to the proceeding are government-controlled and therefore subject to a single country-wide [AD] duty rate." Shandong Rongxin Imp. & Exp. Co. v. United States, 42 CIT __, __, 331 F. Supp. 3d 1390, 1394 (2018) (citing Dongtai Peak Honey Indus. Co. v. United States, 777 F.3d 1343, 1349–50 (Fed. Cir. 2015)). To rebut this presumption and receive a rate separate from the country-wide rate, respondents must demonstrate that the government lacks both de jure and de facto control over their activities. Id. A respondent may show an absence of de facto government control by establishing that it does each of the following: "(1) sets its prices independently of the

---

[2] Many citations are to confidential filings for clarity in explaining the timeline of events. Public versions, occasionally filed at later dates, are available on the public docket with corresponding pagination.

government and of other exporters, (2) negotiates its own contracts, (3) selects its management autonomously, and (4) keeps the proceeds of its sales (taxation aside)." Id. (citing AMS Assocs. v. United States, 719 F.3d 1376, 1379 (Fed. Cir. 2013)). If a respondent fails to demonstrate its independence, which it has the burden of establishing, Commerce may deny it a separate rate and instead apply the country-wide AD rate. Id. (citing Dongtai Peak Honey, 777 F.3d at 1350).

In its previous opinion, the court remanded the Final Results to Commerce. Specifically, the court remanded to Commerce

> its determination that ZMC failed to establish an absence of de facto government control over its activities to: (1) consider the revised translation; (2) address how the labor union had the potential to exercise majority shareholder rights in light of the ESOC; and (3) address how the revised translation impacts its analysis.

Zhejiang I, 471 F. Supp. 3d at 1349. The court based this remand order on several conclusions indicating that Commerce's decision was not supported by substantial evidence. First, the court concluded that Commerce abused its discretion in rejecting ZMC's revised translation of the ESOC Articles, and that because "the revised translation in ZMC's August Submission calls into question a major component of Commerce's response to ZMC, and Commerce itself indicated its reliance on the 'accuracy' of the original translation, the rejection undermines the accuracy of Commerce's final determination." Id. at 1335. Second, the court concluded that "Commerce failed to adequately address the argument that the labor union cannot exercise majority shareholder rights because the ESOC does," and thus failed to adequately address conflicting evidence. Id. at 1347–48. Third, the court concluded that, because Commerce improperly rejected ZMC's revised translation, it did not adequately explain whether the ESOC and the labor union are connected such that there was a potential for government control. Id. at 1348–49.

However, the court upheld Commerce's determination that "that the GOC can control labor union activity through the ACFTU and that Sunny's labor union had sufficient activities that the

ACFTU could influence." Id. at 1346. The court explained that ZMC failed to rebut or provide sufficient detracting evidence for Commerce's explanation of GOC's ability to influence Sunny's labor union because: "(1) the ACFTU has a 'legal monopoly on all trade union activities;' (2) '[t]he Chinese government prohibits independent unions;' and (3) the ACFTU 'preside[s] over a network of subordinate trade unions.'" Id. at 1344 (quoting 30th Administrative Review of the Antidumping Duty Order on Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: China's Status as a Non–Market Economy at 21 (Dep't Commerce Oct. 26, 2017), P.R. 226 ("NME Status Memo")). Finally, the court noted that it took "no position on the issue of whether, with more robust analysis, explanation, and consideration of the evidence, Commerce's determination may be supported by substantial evidence." Id. at 1349.

On remand, Commerce, "under respectful protest," "accepted ZMC's revised translation of Articles 1 and 2 of the ESOC's [Articles]." Remand Results at 10. Upon reconsideration of the record, Commerce nevertheless concluded that "other record evidence demonstrates a connection between the labor union and the ESOC" and, therefore, Zhejiang had not rebutted its presumption of de facto government control. Id. Specifically, Commerce cited Article 20[3] of the ESOC Articles, which indicated a "[[                                                                ]]." Id. Commerce also cited to record evidence of Zhejiang's ownership structure indicating "that the individual shareholders who exercise majority rights . . . are also labor union members." Id. at 11. Contrary to ZMC's claims before Commerce, Commerce noted that it does not distinguish between labor union membership and labor union leadership "because the GOC has the ability to control labor union members to the same extent as labor union leaders, and collectively, these individuals,

---

[3] Article 20 states: [[

]]. Remand Results at 10 (citation omitted).

who are members of the labor union, direct [[          ]] of the equity ownership of Sunny through the ESOC." Id. at 12. Thus, Commerce concluded that notwithstanding ZMC's claims that the ESOC was the true majority shareholder of ZMC, the "GOC can exercise control over the ESOC through its labor union members and, consequently, exercise control over Sunny," specifically through influencing the composition of the board of directors and management. Id. at 14. In short, Commerce concluded that, "[b]ecause ZMC is wholly owned by Sunny, the GOC can, through Sunny, in turn exercise influence over ZMC's selection of management and export activities," and thus that ZMC failed to rebut the presumption of government control. Id.

ZMC challenges Commerce's Remand Results as unsupported by substantial evidence. ZMC claims that Commerce "changed its position and relies almost entirely on the argument that the [Chinese Community Party ("CCP")] controlled Sunny because all of the individual owners of Sunny's ESOC were also members of Sunny's labor union." Pl.'s Br. at 2–3. First, ZMC contends that Commerce's determination that the labor union can control ESOC is not supported by the record because the ESOC and its members constitute a distinct organization unrelated to the GOC or the labor union. Id. at 5–8. Similarly, ZMC argues that the overlapping membership between Sunny's labor union and the ESOC is insufficient to support Commerce's finding of potential de facto control because, "[a]lthough union members can perhaps be controlled by union leaders for union activities," there is no basis "to conclude that union control over union members extends to non-union activities." Id. at 14. ZMC also argues that Commerce's reliance on Article 20 to support its conclusion that Sunny's labor union and the ESOC were connected is insufficient because, as ZMC explains, "Article 20 . . . merely allows labor union members to become members of Sunny's ESOC," but does not require as much. Id. at 15. Thus, ZMC argues that Commerce's reliance on Article 20 ignores that "Articles 19 and 21 demonstrate that the Sunny labor union has

no authority to appoint ESOC members, nor to require the ESOC members be members of the labor union." Id. Finally, ZMC argues that the Remand Results "would fundamentally alter the legal standard that [Commerce] uses for its separate rates analysis," by basing its finding on "any linkage to a CCP entity." Id. at 22; see also id. at 10–11.

The Government responds that the Remand Results "focused on connections between Sunny's labor union and its ESOC and identified additional record evidence . . . that demonstrated such linkages." Def.'s Br. at 10–11. Specifically, the Government points to Commerce's discussion and analysis of the complete overlap of ESOC members and labor union members, as well as Article 20 of the ESOC Articles. Id. at 12–13. Thus, the Government contends that "Commerce has cited to record evidence demonstrating that[,] even if the ESOC does actually exercise majority shareholder rights," overlapping membership in the ESOC and the labor union results in the potential for the GOC to control Sunny through the ESOC. Id. at 13. Additionally, the Government denies ZMC's contention that Commerce changed its position from its original decision, but instead claims that Commerce "provided additional evidence . . . that demonstrates the labor union is not simply a nominal shareholder with no ability to control Sunny, but rather has the actual ability to exercise majority shareholder rights within Sunny through the common membership of the individual shareholders of Sunny's ESOC with Sunny's labor union." Id. at 14. Finally, the Government contests ZMC's contention that ESOC members act in their personal capacity unconnected to their labor union membership by pointing the nature of Commerce's de facto analysis as a rebuttable presumption and explaining that overlapping membership means that "the GOC has the ability to override the actions that union members might individually take if they were free of government control." Id. at 18. Thus, the Government argues that Commerce reasonably determined that there was de facto government control because of these indicators of

"a high degree of coordination between the labor union and the ESOC" and that "Commerce makes no such distinction between union members as individuals or a group in terms of the relative authority the GOC is able to exert." Id. at 23.

The court concludes that Commerce's Remand Results are supported by substantial evidence and in accordance with law. First, Commerce complied with the court's remand instructions by accepting ZMC's revised translation and further identifying and explaining how the record evidence shows an ability by the GOC to control Sunny through the ESOC and Sunny's labor union. The court does not agree with ZMC that Commerce failed to address its argument "that the GOC does not have the ability to control the ESOC because the GOC cannot control individuals to the same extent as an entity." Pl.'s Br. at 4. Commerce specifically explained the ability of the ACFTU to influence labor unions and their members via reference to the NME Status Memo. Remand Results at 28. Further, Commerce explained that "ZMC's effort to distinguish labor union membership from labor union leadership mischaracterizes the issue by attempting to minimize the influence [the] GOC is able to exert through the ACFTU over all labor unions and their members, regardless of leadership hierarchy within a labor union." Id. Thus, Commerce specifically addressed and explained this aspect of its decision and concluded that "the GOC has the ability to control labor union members to the same extent as labor union leaders [and that] [b]ecause each of the . . . members of Sunny's ESOC are also members of its labor union, the ACFTU has the ability to exert control over the ESOC and influence the votes of all labor union members of the ESOC." Id. Commerce's conclusion that ZMC did not rebut the presumption was based on substantial evidence, including reasonable inferences about that evidence. See Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (stating that Commerce's findings may be supported by substantial evidence despite the existence

of "contradictory evidence or evidence from which conflicting inferences could be drawn" (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 487 (1951)). As requested by the court, Commerce adequately explained that record evidence indicating that Sunny's government-affiliated labor union and the members of the ESOC are intertwined. See Zhejiang I, 471 F. Supp. 3d at 1346–49.

Second, the court is unpersuaded by ZMC's additional challenges to the Remand Results. ZMC's arguments are largely based on its disagreement with Commerce's separate rate analysis, which presumes that an entity is subject to potential or actual government control unless a respondent can rebut that presumption by showing independence in each of four indicators analyzed by Commerce. See Shandong Rongxin Imp. & Exp. Co., 331 F. Supp. 3d at 1394. ZMC argues that Commerce's Remand Results attempt to transform this standard into "an irrebuttable presumption that could never be overcome." Pl.'s Br. at 3. However, ZMC's arguments erroneously reverse the burden of rebutting the presumption of government control by arguing that Commerce needed to have shown more direct evidence of actual control above the evidence relied upon. See, e.g., id. at 16 (arguing that Commerce "[h]as [n]ot [r]ebutted" record evidence that undermines its conclusion).

Commerce's conclusion that ZMC failed to rebut the presumption of de facto government control through the connection between Sunny's labor union and the ESOC does not require a showing of actual control, but simply a potential for government control. See Sigma Corp. v. United States, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997). ZMC's argument that "[t]he record shows that the Sunny employees are ultimately individuals acting in their capacity as employee members in the ESOC," Pl.'s Br. at 9, is unpersuasive because it fails to show that Sunny's employees could not act in the interests of the labor union when acting on behalf of the ESOC.

Rather, record evidence showing that there is complete overlap between Sunny's labor union and the ESOC members, that Sunny's labor union registers as the nominal shareholder on behalf of the ESOC, and that both the ESOC and Sunny's labor union exist under the same corporate umbrella reasonably supports the conclusion that there exists a potential for the GOC, through Sunny's labor union, to control the ESOC and Sunny.  Remand Results at 28; see also Def.'s Br. at 23.  Furthermore, ZMC's contention that Commerce must separately examine whether individuals are acting as labor union members or as ESOC members is not administrable, particularly where other evidence supports the two groups' affiliation.  In response to ZMC's comments on the draft remand results, Commerce also explained that its separate rate inquiry always includes analysis of affiliations of top shareholders and connections to CCP membership or leadership because of its need to determine "any ability to control, or possess an interest in controlling, the operations of the company" by an NME government.  Remand Results at 21 (citation omitted).  Thus, because the burden is on a separate rate applicant to show that there is no potential for government control, ZMC's various arguments that Commerce needed to show actual control are unpersuasive.

Because the remainder of ZMC's arguments rest on this mischaracterization of Commerce's de facto government control analysis and the contention that Commerce should have analyzed the actions of the activities of overlapping ESOC and labor union members separately, the court is unpersuaded by and declines to address those additional arguments.  In short, the court concludes that Commerce's Remand Results can be upheld as supported by substantial evidence, in accordance with law and the court's remand instructions.

## CONCLUSION

For the reasons stated, the court sustains Commerce's <u>Remand Results</u>. Judgment will enter accordingly in favor of Defendant.

**SO ORDERED.**

                                            <u>/s/   *Gary S. Katzmann*</u>
                                            Gary S. Katzmann, Judge

Dated: <u>June 23, 2021</u>
         New York, New York